## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| TROY STEPHENSON, CHRISTINA STEPHENSON, SUSAN RUBEL, and STEVEN BARNETT, individually and on behalf of all others similarly situated,<br><br>    Plaintiffs,<br><br>  v.<br><br>ERIE INDEMNITY COMPANY,<br><br>    Defendant. | Civil Action No. <u>2:21-cv-1444</u><br><br>Electronically Filed |

## NOTICE OF REMOVAL

**PLEASE TAKE NOTICE THAT** Defendant Erie Indemnity Co. ("Indemnity"), by and through its counsel, Dechert LLP and Knox McLaughlin Gornall & Sennett, P.C., reserving any and all defenses and exceptions, hereby removes the above-captioned action from the Court of Common Pleas, Allegheny County, Pennsylvania, to the United States District Court for the Western District of Pennsylvania (Erie Division) pursuant to 28 U.S.C. §§ 1441, 1453 on the grounds of the Class Action Fairness Act ("CAFA"), 28 U.S.C. § 1332(d).

In support of this Notice of Removal, Indemnity states as follows:

## INTRODUCTION

1. On August 24, 2021, Plaintiffs Troy Stephenson, Christina Stephenson, Susan Rubel, and Steven Barnett (collectively, "Plaintiffs"), each of whom allegedly "resides" in Pennsylvania, filed their Class Action Complaint (the "Complaint") in the Court of Common Pleas, Allegheny County, Pennsylvania, against Indemnity, a Pennsylvania corporation with its principal place of business in Erie, Pennsylvania.

2.      Plaintiffs plead only one claim, for breach of fiduciary duty.  They purportedly bring that claim "on behalf of themselves and all other similarly situated subscribers of Erie Insurance Exchange ('Exchange') *residing in Pennsylvania*."   Ex. 1, Compl. at 1 (emphasis added).

3.      Indemnity is a public company appointed by the policyholders (the "subscribers") to be responsible for managing the affairs of the Erie Insurance Exchange ("Exchange"), a reciprocal insurer which issues various forms of insurance to citizens of 12 states and the District of Columbia.  In this action, Plaintiffs challenge Indemnity's decision to take 25% of the premiums received by Exchange as compensation for its management services (the "Management Fee").  However, Plaintiffs concede (as they must) that Indemnity is entitled to take a 25% Management Fee under the Subscriber's Agreement that every single subscriber individually signs.  In fact, each subscriber, through the Subscriber's Agreement, explicitly grants Indemnity the right to "retain up to 25% of all premiums written or assumed by ERIE."  Compl. Ex. A.  Accordingly, Plaintiffs make no breach of contract claim in this Complaint, instead limiting themselves to a single claim that, notwithstanding its contractual entitlement, Indemnity nevertheless violated some fiduciary duty by taking the contractually provided Management Fee.

4.      Plaintiffs' own pleading demonstrates that this is an interstate case of national importance that falls in the heartland of CAFA removal jurisdiction.  *See Standard Fire Ins. Co. v. Knowles*, 568 U.S. 588, 595 (2013).  The Complaint affirmatively pleads facts establishing that, for purposes of this action, there is no distinction between Pennsylvania resident subscribers and subscribers from the other 12 jurisdictions in which Indemnity conducts business on behalf of Exchange.  Indeed, throughout the Complaint, Plaintiffs repeatedly lump all subscribers in every geographic location together for purposes of their claim.  And, as their own allegations confirm,

all the central facts they plead clearly apply to *all* subscribers, regardless of where they reside or the particular state of their citizenship. *See infra* ¶¶ 29-37; Compl. ¶¶ 30-31, 33, 38, 44, 63.

5.      Yet, after pleading a claim that is interstate in nature, Plaintiffs then attempt to artificially limit their proposed class to subscribers "residing in Pennsylvania." And that contrived class definition is driven by a transparent and impermissible effort to evade federal jurisdiction under CAFA. But, Supreme Court precedent and a number of lower court decisions prohibit precisely the sort of pleading gamesmanship that Plaintiffs have undertaken in their effort to evade this Court's jurisdiction. *See, e.g.*, *Standard Fire*, 568 U.S. at 595; *Freeman v. Blue Ridge Paper Prods., Inc.*, 551 F.3d 405, 406-07 (6th Cir. 2008); *Hoffman v. Nordic Nats., Inc.*, No. 14-3291 (SWD)(SCM), 2015 WL 179539, at *7 (D.N.J. Jan. 14, 2015), *aff'd*, 837 F.3d 272 (3d Cir. 2016).

6.      The impetus for this pleading artifice is clear: Federal courts have repeatedly rejected previous claims challenging Indemnity's Management Fees. And, in each instance, those rejected claims were pleaded as a putative class of *all* subscribers across *all* jurisdictions in which Exchange has subscribers. None of those complaints survived the pleading stage. It is that same fate that Plaintiffs here are so desperately trying to avoid by attempting to take their claim to a new forum.

7.      Moreover, Plaintiffs do not allege that the "residents" composing their putative class consist only of "citizens" of Pennsylvania. By defining their class based only on residency, as opposed to statutorily required citizenship, Plaintiffs actually have ensured that the minimal diversity required under CAFA exists in this case. Unsurprisingly, a number of the subscribers who are alleged to compose Plaintiffs' Pennsylvania-residents-only putative class are "citizens" of other states, which thereby satisfies CAFA's minimal diversity requirement. *See infra* Section III. The Complaint also makes clear that the amount in controversy totals in the tens (if not

2

hundreds) of millions of dollars—which is far more than the $5 million minimum required under CAFA.  And, finally, the putative class is much larger than 100 people, whether defined to include only Pennsylvania resident subscribers or all subscribers.

8.      In short, Plaintiffs cannot evade federal jurisdiction under CAFA by limiting their class to Pennsylvania "residents" when they do not even attempt to plead any facts that establish a legitimate reason for the transparent and artificial carving up of the putative class pleaded in all the prior cases that have been brought challenging Indemnity's Management Fees.  And, in any event, the putative class that Plaintiffs plead as containing all "residents" of Pennsylvania necessarily contains "citizens" of other states and thus also serves to satisfy the minimal diversity and other requirements under CAFA for removal.  Therefore, removal in this case is proper.

## FACTUAL BACKGROUND

9.      Erie Insurance Group ("Erie") is a reciprocal insurance business consisting of two key entities.  The first entity is Exchange.  Exchange is the insuring entity, which is formed when the Erie policyholders, known as "subscribers"—which now total more than 2 million subscribers across 12 states and the District of Columbia—agree to pool their risk by insuring each other through their exchange of reciprocal insurance obligations.  Hence, Exchange is the legal entity that issues the subscribers' insurance policies.

10.     The second key legal entity is Indemnity.  Indemnity is not an insuring entity, but rather is a public corporation that manages Exchange's insurance function for the subscribers.  It is appointed by each subscriber individually to perform that function because Exchange does not

have (and is not required by law to have) any directors, officers, or employees.  Compl. ¶¶ 28-29; Erie Indemnity Co. 2020 Form 10-K at 3 (Feb. 25, 2021) (hereinafter, "2020 Form 10-K").[1]

11.     The foundational document governing Erie's reciprocal arrangement, and the relationship and rights between and among Indemnity, Exchange, and the subscribers, is the Subscriber's Agreement.  The Subscriber's Agreement is a single page, identical agreement signed individually by *every single* subscriber from all 12 states and the District of Columbia, regardless of where they are domiciled or reside.  The Subscriber's Agreement: (i) creates Exchange through the subscribers' exchange of identical reciprocal insurance obligations; (ii) appoints Indemnity to serve as the management entity on an undifferentiated geographic basis for all of the subscribers; (iii) sets out the responsibilities placed on Indemnity to be met in managing Exchange; and (iv) specifies Indemnity's compensation for providing its services managing Exchange and Erie's insurance business.  Compl. ¶¶ 5-6, 30-32; Compl. Ex. A; 2020 Form 10-K at 3.

12.     Subscribers pay premiums, and "[t]hese premiums, along with investment income, are the major sources of cash that support the operations of the Exchange."  2020 Form 10-K at 35.  The surplus in Exchange that is available to pay claims is "determined under statutory accounting principles, [and] was $10.7 billion and $9.5 billion at December 31, 2020 and 2019, respectively."  *Id.*

13.     Pursuant to the Subscriber's Agreement, each subscriber expressly agreed that Indemnity could "retain up to 25% of all premiums written or assumed by [Erie Insurance

---

[1] Plaintiffs rely upon Indemnity's 2020 Form 10-K in their Complaint.  *See, e.g.*, Compl. ¶¶ 45, 60.  The Third Circuit has held that, in removal proceedings, a district court may take judicial notice of documents "integral to or explicitly relied upon in the complaint," as well as SEC filings. *In re NAHC, Inc. Sec. Litig.*, 306 F.3d 1314, 1331 (3d Cir. 2002) (quoting *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997)).

Exchange]" as "compensation" for its management services, *i.e.*, the Management Fee. *See* Compl. Ex. A; *see also* Compl. ¶¶ 7-8, 38.

14.     There is one Management Fee, and it is set once a year on a nationwide basis. "The process of setting the management fee includes the evaluation of current year operating results compared to both prior year and industry estimated results for both Indemnity and Exchange, as well as consideration of several factors for both entities including: their relative financial strength and capital position; projected revenue, expense and earnings for the subsequent year; future capital needs; as well as competitive position." 2020 Form 10-K at 3. There is no geographic component involved in the process of setting the Management Fee.

15.     Thus, whether Indemnity takes a 0% or 25% Management Fee, geographic factors do not impact the setting of the Management Fee at any point. Consequently, the Management Fee is not dependent in any way on the subscriber's location or by the payment of premiums by any specific subscriber. The Management Fee, to the extent it can be argued to have any impact at all on an individual subscriber, is the same for all subscribers. Plaintiffs do not, and cannot, allege otherwise.

16.     In fact, Plaintiffs allege that the practice which they challenge here has been going on for many years, explaining that while their action "is limited to the breaches occurring within two years of the filing of this Complaint and through trial," the relevant conduct "extends back even further." Compl. at 10 n.1. So, this Complaint attacks the very same practices that were the subject of the complaints previously brought on a nationwide basis and dismissed with prejudice in federal court. *See infra* ¶¶ 42-46.

17.     Indemnity has always honored the compensation cap to which it and every single subscriber agreed. It has never retained more than the 25% Management Fee that the Subscriber's

Agreement expressly authorizes it to retain.  Once again, Plaintiffs do not, and cannot, allege otherwise.

18.    Over the past ten years, Exchange's surplus—the amount available to pay claims and claim-related expenses—has more than doubled.  2020 Erie Indemnity Company Annual Rep. at 5, *available at https://www.erieinsurance.com/investor/financials-and-reports/annual-reports*. As reported in Erie's annual reports, in 2020, the surplus grew to $10.7 billion, an increase of nearly $1.3 billion over the prior year, which, according to Erie, "reflect[ed] a disciplined approach to underwriting and a sharpened focus on investments in a year when surplus was also used to provide a policyholder dividend to [Erie] automobile customers."  2020 Erie Indemnity Company Annual Rep. at 5, 10, *available at https://www.erieinsurance.com/investor/financials-and-reports/annual-reports*.  In 2016, by contrast, the surplus was $7.7 billion, 2016 Erie Indemnity Company Annual Rep. at 4, and in 2009, it was $4.8 billion, 2009 Erie Indemnity Company Annual Rep. at 5.  Given the annual upward trajectory of Erie's surplus—even during a global pandemic— there is no reason to believe that the current surplus is insufficient to cover claims filed, to pay any appropriate dividend, or to fund any necessary expense for the benefit of the subscribers.

19.    For 2020 and 2021, Indemnity set the Management Fee at 25%.  Compl. ¶¶ 70, 76. In 2020, the total Management Fee—for all subscribers across all states and the District of Columbia—was $1.9 billion.  *Id.* ¶ 71; *see also id.* ¶ 14.

20.    As noted above, Plaintiffs do not claim that Indemnity breached the Subscriber's Agreement's 25% Management Fee cap.  Instead, Plaintiffs complain in only conclusory fashion that Indemnity's taking of the Management Fee expressly agreed to by each subscriber in the Subscriber's Agreement "is preventing the same funds from being available to (a) pay dividends

to the Policyholders, (b) fund the loss reserves at Exchange and (c) otherwise be utilized for the Policyholders' benefit." *Id.* ¶ 89.

21.     Plaintiffs make this claim notwithstanding the fact, as noted above, that Exchange's surplus has expanded dramatically over the recent past, and despite Plaintiffs' failure to allege a single fact that even begins to remotely articulate any reasonable basis to believe that the ability of Exchange to meet its responsibilities to the subscribers is in any danger at all, let alone as a result of the specific level of Management Fee.

22.     Moreover, the Subscriber's Agreement specifically states that it is only *after* Indemnity's Management Fee is paid from the premiums received that the "*rest of the premiums will be used for losses, loss adjustment expenses, . . . establishment of reserves and surplus, . . . dividends and other purposes* [Indemnity] decide[s] are to the advantage of Subscribers." Compl. Ex. A.  In other words, every subscriber has agreed, in direct conflict with what Plaintiffs now allege, that dividends, loss reserves, and other items beneficial to subscribers must come out of the premium dollars left over *after*, not existing *before*, the Management Fee is paid.

23.     Plaintiffs' claim is not in any way specific to Pennsylvania subscribers.  Instead, based on their own allegations, the allegations of putative subscriber classes in the prior federal Management Fee litigation, and the inherent nature of the Management Fee set by Indemnity, Plaintiffs' claim and any resulting remedy would apply equally to subscribers who are citizens in the 12 states and the District of Columbia where Exchange issues policies.

## GROUNDS FOR REMOVAL

24.     Plaintiffs filed a class action within the meaning of 28 U.S.C. § 1332(d)(1)(B). Compl. ¶¶ 92-105.

25.     The Court has original jurisdiction over this action pursuant to CAFA because: this action is interstate in nature, at least one member of the putative plaintiff class is diverse from Indemnity, and the amount-in-controversy and class size requirements are satisfied.  28 U.S.C. § 1332(d)(2).  Plaintiffs, however, still attempt to evade the jurisdiction of this Court.

**I.      CAFA's Jurisdictional Requirements Are Satisfied Based On The Allegations In Plaintiffs' Complaint.**

26.     The United States Supreme Court has held that CAFA's "primary objective [is] ensuring '[f]ederal court consideration of interstate cases of national importance.'"  *Standard Fire*, 568 U.S. at 595 (quoting Class Action Fairness Act of 2005, Pub.L. No. 109-2, § 2(b)(2), 119 Stat. 4).  This case falls squarely within that objective.

27.     Exchange has over two million subscribers in the District of Columbia and 12 states: Illinois, Indiana, Kentucky, Maryland, New York, North Carolina, Ohio, Pennsylvania, Tennessee, Virginia, West Virginia, and Wisconsin.  *About Erie Insurance*, Erie Insurance, https://www.erieinsurance.com/news-room/fact-sheet (last visited Oct. 20, 2021).  Pursuant to their membership in Exchange, subscribers enter into contracts for insurance with Exchange throughout that geographic territory.

28.     Regardless of Plaintiffs' effort to artificially limit the scope of the putative class, taking the Complaint's allegations as a whole, *see Kedra v. Schroeter*, 876 F.3d 424, 441 (3d Cir. 2016), and focusing on the substance of Plaintiffs' allegations rather than form, *Standard Fire*, 568 U.S. at 595 (explaining CAFA should not "exalt form over substance"), this action clearly pleads an interstate case of national importance.

29.     Plaintiffs here do not allege that Indemnity has ever treated, or even thought about, subscribers who are citizens of Pennsylvania any differently from subscribers in other states or the District of Columbia in the setting of the Management Fee.  To the contrary, the Complaint alleges

that Indemnity's duties to subscribers are owed and fulfilled on a geographically undifferentiated basis, and that subscribers' relationships with Indemnity actually operate on a geographically undifferentiated basis. Specifically, the Complaint expressly alleges:

(a)     All subscribers "executed materially identical Subscriber's Agreements" when they became policyholders of Exchange, Compl. ¶ 30;

(b)     All subscribers "designated Indemnity to be their agent and attorney-in-fact to manage the business of Exchange on their behalf," *id.* ¶ 31;

(c)     Indemnity is a fiduciary for all subscribers, *id.* ¶ 33;

(d)     Indemnity owes fiduciary duties to all subscribers "to avoid conflicts of interest and to act in the best interests of Policyholders," including with respect to setting the Management Fee and disclosing the basis for the Management Fee rate, *id.* ¶ 63;

(e)     Indemnity takes a percentage of annual premiums paid by all subscribers as a Management Fee, *id.* ¶ 38; and

(f)     Indemnity's annual decision in setting the Management Fee impacts all subscribers, *id.* ¶ 44.

30.     And, critically, Paragraph 3 of the Subscriber's Agreement, which is identical in every Subscriber's Agreement and which authorizes Indemnity to take up to a 25% Management Fee, makes *no* reference to the geographic location of the subscriber and thus does not differentiate based on the subscriber's location. Compl. Ex. A. Indemnity's authority to retain the Management Fee thus applies equally to all subscribers regardless of geographic location. Apparently recognizing that fact, Plaintiffs affirmatively allege that the Management Fee is drawn from "*all premiums* written or assumed by ERIE." *Id.* (emphasis added).

31.     Exchange's surplus is the total amount of money that comes from all subscribers across all jurisdictions and is available to pay claims, declare dividends, and otherwise do the things that are in the best interests of the subscribers.  Thus, the surplus is undifferentiated by particular subscribers or their respective geographic locations.

32.     Indeed, because no geographic distinction is pleaded (or exists) with respect to how the Management Fee is set or implemented, Plaintiffs do not even attempt to isolate or distinguish Pennsylvania subscribers in their allegations.  Instead, Plaintiffs identify themselves and the putative class as exemplary "Policyholders," who represent all policyholders or subscribers of Exchange.  *See* Compl. ¶ 4 ("Plaintiffs and the putative class members in this lawsuit are policyholders of Exchange ('the Policyholders').").

33.     Therefore, when it comes to the Management Fee, there is no difference between subscribers who are citizens or residents of Pennsylvania and subscribers who are citizens or residents of any other jurisdiction in which Erie operates.  Plaintiffs define their putative class as subscribers who are "similarly situated policyholders of Erie."  Compl. at 1.  That governing definition of the class, and the allegations of their own Complaint which underlie it, establish that Plaintiffs plead an interstate, rather than a Pennsylvania-only case.

34.     The interstate nature of the relief sought by Plaintiffs further confirms that the suit is interstate in nature.  Plaintiffs' requests for relief confirm that their effort to restrict the putative class definition to Pennsylvania residents is not genuine.  They request a ruling "(1) [f]inding that Indemnity has breached its fiduciary duties; (2) [a]warding damages in an amount to be determined at trial; and (3) [a]warding such other relief, including disgorgement of profits or other injunctive relief, that this Court deems just and proper."  Compl. at 20.  They do not limit those requests geographically and it would be impossible for them to do so.

10

35.     Plaintiffs' refusal to plead any basis for any geographic differentiation for their claims flows directly from the undisputed fact that only one decision is made each year by Indemnity in setting its Management Fee.  That unitary decision affects all subscribers equally, if at all, regardless of where they reside.

36.     Plaintiffs' request for a declaratory judgment and injunction accordingly attacks that singular, universally applicable decision:  Any finding or declaration that Indemnity breached its fiduciary duties by taking 25% as its Management Fee is necessarily a finding or declaration that Indemnity breached its fiduciary duties to *all subscribers regardless of location* by taking that fee from the undifferentiated pool of premiums paid by *all subscribers regardless of location*.  And any declaration or injunctive relief against Indemnity's Management Fee for 2020, 2021, or going forward, would necessarily apply to the single rate set for the Management Fee applicable to *all subscribers regardless of location*.

37.     As a result, Plaintiffs' requested relief would necessarily impact the Management Fee as a whole, which comes from the premiums paid over the last two years by *all subscribers*— not just those residing in Pennsylvania—along with all money held in Exchange for loss reserves, expenses, or dividends—which is a nationwide pool that is not segregated by jurisdiction. Similarly, injunctive relief concerning the setting of the Management Fee necessarily would affect all subscribers to the same degree, including those who are citizens of the other 12 jurisdictions in which Exchange issues policies.

38.     When fairly read, the allegations of Plaintiffs' own complaint, including the relief sought, establish a multi-state, rather than a Pennsylvania-only claim targeting many millions of dollars.  Plaintiffs' allegations clearly set out an interstate case of national importance, which

necessarily satisfies CAFA's minimal diversity requirement for removal.  Therefore, on the basis of Plaintiffs' pleading alone, the requirements of CAFA have been met.

## II.     CAFA Jurisdiction Also Exists Because Plaintiffs Have Improperly Sought To Evade Federal Jurisdiction By Asserting An Artificial And Conclusory Class Definition.

39.     In *Standard Fire*, 568 U.S. at 595, the Supreme Court held that parties cannot "exalt form over substance" and rejected the plaintiff's effort to ignore the underlying reality of its claims by stipulating to an artificially low damages cap on behalf of the putative class in order to contravene CAFA's amount in controversy requirement.  Because it was clear to the Court in its reading of the complaint that the claims would exceed CAFA's amount in controversy requirement, the Court held that the plaintiffs' evasion tactic could not serve to prevent removal.

40.     As noted above, Plaintiffs' own allegations establish that no geographic element factors into the setting of the Management Fee.  And, in light of that, their utter failure to plead any reasonable basis to justify a Pennsylvania-only class of subscribers represents the same type of poorly disguised attempt to evade jurisdiction rejected in *Standard Fire*.

41.     The transparent nature of Plaintiffs' attempt to evade federal jurisdiction is highlighted by the fact that prior federal complaints challenging the Management Fee all alleged a class definition that directly contradicts Plaintiffs' effort to artificially limit their class to Pennsylvania residents.

42.     Plaintiffs' Complaint is far from the first of its kind.  Since 2012, Indemnity has faced several complaints in federal court based on the same purported wrong alleged here—*i.e.*, that Indemnity took an excessive Management Fee.  In each instance in which those complaints were pleaded as a class action, they were pleaded as a nationwide putative class that included ***all*** subscribers across ***all*** states and the District of Columbia where there are subscribers.  The class pleaded by subscriber-plaintiffs has never before been limited to any specific geographic location.

12

43.     Not one of those prior federal court complaints survived the pleading stage.

44.     First, in *Beltz v Stover, et al.*, No. 1:13-cv-37 (W.D. Pa.) ("*Beltz I*"), the plaintiffs pleaded a putative class action challenging Indemnity's Management Fee and service charges as being in excess of the 25% compensation cap set in the Subscriber's Agreement.  The three named plaintiffs, who allegedly were "residing in Allegheny County and Fayette County, Pennsylvania,"[2] asserted that, since 2007, Indemnity had taken the maximum 25% Management Fee under the Subscriber's Agreement in violation of fiduciary duties owed to the subscribers.  *Beltz I* Compl. ¶¶ 3, 35-36 (Feb. 6, 2013).   In doing so, *Beltz I* invoked CAFA and alleged that "Exchange currently has more than two million Policyholders in at least ten different states (Illinois, Indiana, Maryland, North Carolina, Ohio, Pennsylvania, Tennessee, Virginia, West Virginia and Wisconsin) and the District of Columbia," *id.* ¶¶ 25-26, and sought to represent, without geographic limitation, "*all Policyholders of Exchange as of the date of the filing of [the] complaint*, as a class," *id.* ¶¶ 48-49 (emphasis added).

45.     Next, in *Beltz v. Erie Indemnity Co.*, No. 1:16-cv-179 (W.D. Pa.) ("*Beltz II*"), the same three subscribers from *Beltz I* brought another class action against Indemnity and its directors, again challenging Indemnity's retention of service charges as a violation of the 25% compensation cap of the Subscriber's Agreement and claiming that Indemnity's Management Fee was "excessive"—despite acknowledging the fact that the fees had always been at or beneath what they admitted to be the contractually authorized 25% cap.  *Beltz II* Compl. ¶ 84 (July 8, 2016). Like *Beltz I*, the plaintiffs in *Beltz II* invoked CAFA jurisdiction on behalf of a putative class of ***"[a]ll current and former Subscribers of Erie Insurance Exchange between September 1, 1997***

---

[2] Plaintiffs here also reside in Allegheny County and Fayette County.  Compl. ¶¶ 19-22.

*and the present*" on an undifferentiated geographic basis. *Id.* ¶¶ 8, 89 (emphasis added). And the *Beltz II* plaintiffs further affirmatively pleaded that a class action was necessary to avoid "a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of other members not parties to the adjudications or substantially impair or impede their ability to protect their interests," and that "Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole." *Id.* ¶¶ 100-01.

46.     Finally, the most recent action, *Ritz v. Erie Indemnity Co.*, No. 1:17-cv-340 (W.D. Pa.), involved nearly identical allegations to those here, brought by another Erie subscriber who alleged she was a Pennsylvania citizen, against Indemnity and its directors. *Ritz* Compl. ¶ 10 (Dec. 28, 2017). Specifically, Ms. Ritz alleged, among other things, that Indemnity's taking of a 25% Management Fee breached Indemnity's fiduciary duties because it was excessive, despite the fact it never exceeded the 25% cap set out in the Subscriber's Agreement. *See generally Ritz* Compl. The *Ritz* plaintiff also sought, among other things: (i) a declaration that the Management Fee was excessive, (ii) compensatory and punitive damages, and (iii) an injunction prohibiting Indemnity and the directors "from continuing to retain excessive Management Fees." *Id.* at 40. Ms. Ritz sought to represent a putative class of "[a]ll current and former Subscribers of Erie Insurance Exchange during the applicable statute of limitations." *Id.* ¶ 78. And, she further pleaded that a class action pursuant to Rule 23 was necessary to avoid inconsistent, varying adjudications and incompatible standards because such adjudications "would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications." *Id.* ¶ 89.

47.     Plaintiffs' legal theory and relief sought here is indistinguishable from the fiduciary duty claims made by their fellow subscribers in those prior cases. Indeed, the Complaint explicitly

alleges that the challenged conduct "with respect to the Management Fee extends back even further," while purporting to limit Plaintiffs' claim to events "occurring within two years of the filing th[e] Complaint and through trial." Compl. at 10 n.1. Thus, all of these prior plaintiffs not only affirmatively maintained that there is no geographically relevant difference amongst subscribers for the purpose of challenging the setting of the Management Fee, but also that to proceed on anything other than a national basis would necessarily affect all subscribers in every jurisdiction where Exchange policies exist. Plaintiffs make no attempt and have no valid basis to argue otherwise here.

48.     In considering the legal significance of these prior cases, their alleged class definitions, and the ultimate dismissal of those matters, it is vital to remember that Plaintiffs here, as subscribers, are in *privity* with the plaintiffs in those earlier actions.[3] Indeed, they were all subscribers at the time that the earlier actions were litigated. Plaintiff Stephenson has had active policies since May 26, 2006, and therefore was a subscriber at the time that all three earlier actions were litigated. Plaintiff Barnett has had active policies since August 11, 2014, and so was a subscriber at the time of both the *Beltz II* and *Ritz* actions. And Plaintiff Rubel began coverage on February 20, 2015, which likewise made her a subscriber at the time of both the *Beltz II* and *Ritz*

---

[3] When Chief Magistrate Judge Eddy dismissed the *Ritz* complaint with prejudice, she concluded that all subscribers are in privity with each other because they are "cosigners to the same Subscriber's Agreement at issue." *Ritz v. Erie Indem. Co.*, No. 1:17-CV-00340-CRE, 2019 WL 438086, at *6 (W.D. Pa. Feb. 4, 2019), *recons. denied*, No. 1:17-CV-00340-CRE, 2019 WL 2090511 (W.D. Pa. May 13, 2019). She held that: "It is undisputed that the Subscriber's Agreement appoints Indemnity, through its Board, as the Exchange's attorney-in-fact, and this Subscriber's Agreement creates the reciprocal insurance exchange. In other words, the *Beltz II* plaintiffs and Ritz are co-beneficiaries of and cosignatories to the same contract that obligates Indemnity to provide the management services for the Exchange, and the nature of this relationship creates privity for claim preclusion purposes." *Id.* This holding was never appealed.

actions.  In addition, the former *Beltz* and *Ritz* plaintiffs are all still Erie subscribers today, and therefore their time as subscribers—and as co-beneficiaries of and cosignatories to the Subscriber's Agreement—overlaps with the current Plaintiffs.  As a result, Plaintiffs here are in privity with the *Beltz* and *Ritz* plaintiffs, just as the *Ritz* plaintiff was in privity with the *Beltz* plaintiffs, and importantly, were part of the nationwide classes alleged in those actions.[4]

49.     By limiting their proposed class to Pennsylvania residents, Plaintiffs attempt to carve out a subset of subscribers that is fundamentally at odds with the content of their own pleading and the class asserted in prior actions by their fellow subscribers with whom they are in privity.  Plaintiffs do not and cannot articulate any reasonable basis for distinguishing their artificially constructed class definition from the class definition of all the subscribers with whom they are in privity and whose actions challenging the Management Fee preceded theirs.

50.     Plaintiffs' transparent attempt to pursue this "interstate case of national importance" while evading CAFA jurisdiction should not be countenanced. This lawsuit challenging the setting of the Management Fee, like the cases before it, belongs in federal court.

III.    **In All Events, Plaintiffs' Attempt To Evade CAFA Jurisdiction Fails Because CAFA Is Based On Citizenship And Plaintiffs Plead A Class Based On Residency.**

51.     Plaintiffs' improper effort to artificially limit its class to Pennsylvania "residents" fails to defeat CAFA jurisdiction for a separate and independent reason:  Diversity jurisdiction is determined based on citizenship not on residency, and, unsurprisingly, there are "residents" in Plaintiffs' putative Pennsylvania-only class who are "citizens" of different states.  Thus, despite their attempt to artificially limit their class, the minimal diversity required for federal jurisdiction

---

[4] To be clear, Indemnity does not mean to suggest that any such class should be certified, but rather that the class definition pleaded in the *Beltz* and *Ritz* cases only further confirms that the artificially limited class that Plaintiffs plead here is an improper attempt to evade CAFA jurisdiction.

under CAFA is still met in this case because of the manner in which Plaintiffs, themselves, defined their intended class.

52.     Indemnity is a corporation organized under the laws of Pennsylvania with its headquarters and principal place of business in Erie, Pennsylvania, meaning it is a Pennsylvania citizen for diversity jurisdiction purposes.  Compl. ¶ 24.

53.     If any member of Plaintiffs' proposed class is a citizen of a state other than Pennsylvania, there is minimal diversity for purposes of CAFA.  28 U.S.C. § 1332(d)(2)(A).  To determine whether minimal diversity exists, the Court considers the citizenship of *all* putative class members, *both named and unnamed*, who fall within the definition of the proposed class.  *Id.* § 1332(d)(1)(D) (emphasis added).

54.     Plaintiffs plead a class of "Pennsylvania *residents*," not citizens.  Compl. ¶ 92 (emphasis added).  Plaintiffs further plead that, to their knowledge, there are no other cases in which a "Pennsylvania plaintiff seeks to represent a class of Pennsylvania *residents* based on the conduct alleged in this Complaint."  *Id.* ¶ 102 (emphasis added).  *See also id.* at 1 (pleading "on behalf of themselves and all other similarly situated policyholders of Erie Insurance Exchange ('Exchange') *residing* in Pennsylvania" (emphasis added)).

55.     The distinction between residency and citizenship is a critical one for federal diversity jurisdiction.  In the context of jurisdiction, "the term 'citizen' in 28 U.S.C. § 1332 has long meant something different from 'resident.'"  *Hargett v. RevClaims, LLC*, 854 F.3d 962, 965 (8th Cir. 2017); *Steigleder v. McQuesten*, 198 U.S. 141, 143 (1905) ("[R]esidence and citizenship [are] wholly different things.").  "'Citizenship' requires permanence.  Residency is a more fluid concept."  *Hargett*, 854 F.3d at 965 (internal citations omitted).  Diversity jurisdiction thus turns on citizenship, not mere residency.

56.     Logic necessarily dictates that not all residents of Pennsylvania are citizens of Pennsylvania.  *See, e.g.*, *Blockbuster, Inc. v. Galeno*, 472 F.3d 53, 59 (2d Cir. 2006) (holding minimal diversity satisfied where Blockbuster was a Texas and Delaware citizen, the plaintiff was a New York resident, and the putative class was comprised of thousands of New York customers because "it seems plain to us that Blockbuster is able to meet its burden of showing there is a reasonable probability that at least one of these class members is a citizen of New York and thus is 'a citizen of a State different from . . . defendant'" (quoting 28 U.S.C. § 1332(d)(2)(A))).  There are at least hundreds of thousands of Erie policies in effect in Pennsylvania.  Therefore, as in the Second Circuit's *Blockbuster* decision, because Plaintiffs here allege that there are "thousands" of members in their proposed class, "it seems plain" that Indemnity will be able to "meet its burden of showing there is a reasonable probability that at least one of these class members is a citizen . . . of a state different from [Indemnity]," here, Pennsylvania.  *Id.*  On this basis alone, Indemnity has met its burden of showing that the minimal diversity requirement is satisfied.

57.     Additionally, even putting aside the sheer number of subscribers residing in Pennsylvania and the virtual certainty that some of those subscribers are citizens of other states, additional strong evidence establishes that the minimal diversity requirement has been met in this case.  Courts routinely recognize that certain categories of residents are especially likely not to be citizens of the state in which they currently live.  For instance, out-of-state students are generally considered temporary residents who are not domiciled in the state in which they study.  *See, e.g.*, Wright & Miller, 13E Fed. Prac. & Proc. Juris. § 3619 (3d ed.); *Nytes v. Trustify, Inc.*, 297 F. Supp. 3d 191 (D.D.C. 2018) (finding a DC college student that worked in DC and started a business there was still domiciled in California); *Harrell v. Kepreos*, No.Civ.04-3082-CO, 2005 WL 730639 (D. Or. Mar. 30, 2005) (finding plaintiff domiciled in Oregon despite attending school and working as

a caregiver in California). Similarly, residents who are in the military are presumed to retain the domicile of their permanent residence. *See, e.g.*, Wright & Miller, 13E Fed. Prac. & Proc. Juris. § 3620; *Melendez-Garcia v. Sanchez*, 629 F.3d 25, 41 (1st Cir. 2010) ("Service personnel are presumed not to acquire a new domicile when they are stationed in a place pursuant to orders; they retain the domicile they had at the time of entry into the services." (citation omitted)); *Turek v. Lane*, 317 F. Supp. 349, 350 (E.D. Pa. 1970) ("The domicile of a serviceman at the time of enlistment is presumed not to change, and evidence of an intention to change must be 'clear and unequivocal.'").

58.     Moreover, basic subscriber data demonstrates that many subscribers who are residents of Pennsylvania are citizens of other states. Exchange has over 13,000 personal line policies (which includes automobile, homeowners, tenant, and umbrella policies) insuring risks in Pennsylvania where the subscribers maintain out-of-state mailing addresses. And more than 1,000 of these policies have mailing addresses in Florida, which is obviously a warm-weather retirement location where many people establish citizenship to take advantage of, among other things, the favorable tax environment.

59.     Considering automobile policies alone, there are over 1,500 personal automobile policies insuring risks in Pennsylvania where the insured has an out-of-state driver's license—which is alone sufficient to reach the conclusion that at least some of these Pennsylvania resident subscribers are out-of-state citizens.

60.     To provide just two individual examples that illustrate the point: One subscriber is an elderly individual who has automobile, umbrella, and tenant policies in Pennsylvania, but has a Florida driver's license and a home in that state—which suggests that the subscriber maintains a residence in Pennsylvania but has established citizenship in Florida. Another subscriber has a

19

Pennsylvania tenant policy and a Pennsylvania automobile policy, but also has a Virginia homeowners policy, a Virginia automobile policy, and a Virginia driver's license.  Taken together, these facts indicate that the subscriber is a resident in Pennsylvania (per the tenant and automobile policies), while retaining citizenship in Virginia (per the driver's license, homeowners policy, and automobile policy).  Thus, even within Plaintiffs' artificially limited definition, their putative class clearly includes at least one member who is a "resident" of Pennsylvania but a "citizen" of another state.

61.     Additionally, the putative class includes commercial entities that are "residents" of Pennsylvania but "citizens" of other states.  Indeed, there are over 2,000 commercial policies insuring risks in Pennsylvania that identify an out-of-state mailing address—many of which insure real property in Pennsylvania.  For example, one subscriber business is both incorporated and headquartered in Virginia, which makes it a citizen of that state, but it maintains facilities in State College, York, Harrisburg, Pittsburgh, Wilkes Barre, Uniontown, Greensburg, Lancaster, and Fairless Hills, Pennsylvania.  Again, by themselves, these facts establish that at least some Pennsylvania resident subscribers are out-of-state citizens.

62.     These facts and examples are by no means exhaustive or comprehensive.  But they illustrate the unavoidable truth that at least one putative class member—out of the hundreds of thousands of subscribers in the putative class—is a citizen of a state other than Pennsylvania, which is all that is required to satisfy CAFA's minimal diversity requirement.

63.     In the face of this common-sense reality, Plaintiffs have made no allegations about the citizenship of the members of their proposed resident class.  And, and as described above, Plaintiffs do not allege that their proposed class, defined in terms of residents, excludes citizens of other states who are only temporarily "residing" in Pennsylvania.  This failure to plead, coupled

with the controlling legal presumptions applicable here and the facts set out above, is more than enough to establish that, even taking Plaintiffs' artificially constrained class definition on its face, this case still meets CAFA's minimal diversity requirement.

## IV.   The Remaining Jurisdictional Prerequisites Are Satisfied.

64.    Removal is proper because the Complaint establishes that Plaintiffs plead an amount in controversy that exceeds $5,000,000.  *See* 28 U.S.C. § 1332(d)(2).

65.    Plaintiffs assert that Indemnity's taking of a 25% Management Fee in 2020 and 2021 was excessive and, among other things, seek disgorgement of all improperly taken amounts. In 2020 alone, the Management Fee was $1.9 billion.  Compl. ¶ 71.  Thus, the relief sought here clearly exceeds $5,000,000.

66.    Plaintiffs also seek unspecified forward-looking injunctive relief that—whether coupled with disgorgement of the allegedly excessive fee as discussed above or on its own— obviously puts more than $5,000,000 in controversy in this case.

67.    Removal is also proper because the proposed plaintiff class is greater than 100 persons and therefore exceeds CAFA's minimum number of class members.  28 U.S.C. § 1332(d)(5).  Plaintiffs allege that, even considering Pennsylvania residents alone, "on information and belief, the number [of class members] is in the thousands."  Compl. ¶ 95.

68.    And, properly considering the claim's potential impact on all subscribers, Exchange currently has over two million subscribers across all jurisdictions in which it offers insurance, which easily satisfies CAFA's numerosity requirement.  *About Erie Insurance*, Erie Insurance, https://www.erieinsurance.com/news-room/fact-sheet (last visited Oct. 20, 2021).

## V.      CAFA's Removal Requirements Are Satisfied.

69.      As required by 28 U.S.C. § 1446(b), this Notice of Removal is being filed within thirty (30) days after Indemnity accepted service of the Complaint and filed its Acceptance of Service form in the Court of Common Pleas, Allegheny County, Pennsylvania.  Ex. 1.

70.      This Notice of Removal is being filed in the U.S. District Court for the Western District of Pennsylvania, the district court of the United States for the district and division within which the state court action is pending, as required by 28 U.S.C. §§ 1446(a) and 1441(a).

71.      Pursuant to Local Rule 3 and this Complaint's relation to the *Beltz II* and *Ritz* matters, the matter should be docketed on the calendar of the Erie Division.  W.D. Pa. L.R. 3, 40(D).

72.      Indemnity has not filed a responsive pleading in the action that Plaintiffs commenced against Indemnity in the Court of Common Pleas, Allegheny County, Pennsylvania, and no other proceedings have transpired in that action.

73.      Promptly after filing this Notice of Removal with the U.S. District Court for the Western District of Pennsylvania, a copy of this Notice of Removal, along with the Notice of Filing of Notice of Removal, will be filed with the Prothonotary of the Court of Common Pleas, Allegheny County, Pennsylvania, pursuant to 28 U.S.C. § 1446(d).  A copy of both documents will also be served upon Plaintiffs' counsel of record.  A copy of the Notice of Filing of Notice of Removal is annexed hereto as Exhibit 2.

## VI.     Indemnity Reserves All Rights And Denies Liability.

74.      Nothing in this Notice is intended or should be construed as an express or implied admission by Indemnity, including but not limited to an admission of any fact alleged by Plaintiffs; of the validity or merit of any of Plaintiffs' claims or allegations; that Plaintiffs are entitled to any of the relief they seek in the Complaint, or any other relief; or that the certification of any class of

Erie subscribers, no matter how constituted, is appropriate under Federal Rule of Civil Procedure 23, the Pennsylvania state court rules related to class certification, or any other applicable law or rule.  Further, nothing in this Notice is intended or should be construed as a limitation of any of Indemnity's rights, claims, remedies, or defenses in connection with this action.  Indemnity expressly reserves all such rights and defenses.

**WHEREFORE**, this action, as a consequence of this Notice of Removal, should be deemed removed from Common Pleas Court of Allegheny County, Pennsylvania and placed on the docket of the Erie Division of this Court.

Dated:  October 20, 2021

Respectfully submitted,

/s/ Neal R. Devlin
Neal R. Devlin (PA 89223)
KNOX MCLAUGHLIN GORNALL &
SENNETT, P.C.
120 West 10th Street
Erie, PA 16501-1461
Telephone: (814) 923-4841
Facsimile: (814) 453-4530
ndevlin@kmgslaw.com

Steven B. Feirson (PA 21357)*
Michael H. McGinley (PA 325545)*
Carla Graff (PA 324532)*
DECHERT LLP
Cira Centre
2929 Arch Street
Philadelphia, PA 19104-2808
Telephone: (215) 994-4000
Facsimile: (215) 994-2222
Steven.Feirson@dechert.com
Michael.McGinley@dechert.com
Carla.Graff@dechert.com

*Counsel for Defendant Erie Indemnity Company*

**pro hac vice* applications forthcoming

## CERTIFICATE OF SERVICE

I hereby certify that on this 20th day of October 2021, a true and correct copy of the foregoing Notice of Removal was served upon counsel of record for Plaintiffs via first class mail and email at the addresses below:

Edwin J. Kilpela, Jr., Esq.
CARLSON LYNCH LLP
1133 Penn Avenue, 5th Floor
Pittsburgh, PA 15222
ekilpela@carlsonlynch.com

Kevin Tucker, Esq.
Kevin J. Abramowicz, Esq.
Chandler Steiger, Esq.
Stephanie Moore, Esq.
EAST END TRIAL GROUP LLC
6901 Lynn Way, Suite 215
Pittsburgh, PA 15208
ktucker@eastendtrialgroup.com
kabramowicz@eastendtrialgroup.com
csteiger@eastendtrialgroup.com
smoore@eastendtrialgroup.com

Prothonotary, Court of Common Pleas, Allegheny County, Pennsylvania


Dated:  October 20, 2021                    */s/ Neal R. Devlin*
Neal R. Devlin (PA 89223)
KNOX MCLAUGHLIN GORNALL &
SENNETT, P.C.
120 West 10th Street
Erie, PA 16501-1461
Telephone: (814) 923-4841
Facsimile: (814) 453-4530
ndevlin@kmgslaw.com

*Counsel for Defendant Erie Indemnity Company*